### In re LALLY.

(District Court, N. D. New York. February 5, 1919.)

1. BANKRUPTCY ⟨⟩415(3)—REVIEW OF ACTION OF REFEREE—FINDINGS OF FACT.

    The findings of fact of a special master or of a referee on application for discharge stand in substantially the same position before the court as does the verdict of a jury, and are not to be disturbed, unless unsupported by the evidence or against the weight thereof.

2. BANKRUPTCY ⟨⟩414(1)—OBJECTIONS TO DISCHARGE—BURDEN OF PROOF.

    A bankrupt, who has conformed to the requirements of the statute, is prima facie entitled to a discharge; and the burden of proof rests on an objecting creditor to establish by satisfactory evidence some one of the designated acts which will defeat his right thereto.

3. BANKRUPTCY ⟨⟩414(3)—OBJECTIONS TO DISCHARGE—PROOF.

    Proceedings on an application for discharge are civil, and where criminal acts are alleged to defeat the discharge, they must be proved by clear, convincing, and satisfactory evidence, although not beyond a reasonable doubt.

In Bankruptcy. In the matter of William P. Lally, bankrupt. On motion to confirm report of special master recommending discharge. Confirmed.

W. H. Weller, of Utica, N. Y., for bankrupt.
Sholes & Norton, of Utica, N. Y., for creditors.

RAY, District Judge. It is claimed by the objecting creditors, not only that the bankrupt has concealed assets from his trustee in bankruptcy, but that he made a false oath in verifying his schedules. These claims are based on the alleged ownership by the bankrupt, William P. Lally, of the products of the farm which he occupies, owned by a Miss Peck, or of an interest therein, and of certain other personal property thereon. The facts seem to be these:

The bankrupt is married and has two small children, but before marriage, if not now, was what is termed in the brief of Messrs. Sholes & Norton, and is uncontradicted, a "ne'er-do-well," who met with considerable success in that line of business, and all that he succeeded ·

in accumulating consisted, and still consists, of a few judgments and claims against himself owned by others, including his father, which are unpaid, and which he seeks "to get rid of" in bankruptcy proceedings, finding them cumbersome and undesirable. As the father is a man of some considerable means, it is not at all incredible that he desires to see his son in an unshackled condition; that is, freed from all connection with these judgments and claims. It is not claimed that prior to the time this son went upon the Peck farm, which he now occupies, he had accumulated any of this world's goods, except some household furniture and two old harnesses.

His father, Thomas Lally, is a retired farmer, and owns a farm in Sangersfield, N. Y., on which one of his sons resides. This other son, the bankrupt, had removed to a farm in Norwich, Chenango county, N. Y., which he rented or worked on shares, and where, it seems, he was meeting with the same success he had achieved before marriage, when he ran a threshing machine, filled silos, and engaged in "tending bar" in saloons or hotels. He had boarded with his father, but omitted to pay his board. The father had also guaranteed payment for a pair of horses purchased by this son on credit, and which guaranty he had to make good, reimbursing himself by selling the horses.

Prior to the beginning of the farm-working season of 1916, Mr. Lally, the father, made a written lease with Miss Peck, who owned a farm in the vicinity of Waterville, N. Y., for such farm, which was a "hop and dairy farm," and this contains no provision or suggestion that William P. Lally, the bankrupt, was to have any interest in the farm or its products, or of the property thereon. It was understood, however, between the father and Miss Peck that the now bankrupt was to go on and at least occupy the farm, if not work it. The father, as a witness before the special master, says he told Miss Peck:

"William is the one who is going to take charge of the farm, and he is going to *supervise the work*. I will be there only occasionally, and I would suggest that you turn over one-half the milk checks to him to pay the running expenses of the farm, paying the hired help and living expenses, expenses required to carry on the farm."

In 1916 there were two or three hired men on the farm. The son, William P. Lally, did go on the farm with his family, and it was worked and the pay for the milk delivered at the milk station and for other crops and products sold, except the hops, went first to Miss Peck, who, deducting her share, paid over the other half or share to William P. Lally, the now bankrupt, and not to the father, the lessee of the farm, except the hop money; that is, the proceeds of the hops raised on the farm. It is evident from the evidence that the son, William P. Lally, did have "the living" of himself and family from the proceeds of the farm, and there is no evidence of any contract or agreement between the father and son as to any specific sum or rate of wages that was to be paid, or that the interest of the father in the lease was ever assigned to the son. It is claimed that, from all the circumstances and what was done, the court is authorized to find and should find, notwithstanding the report of the special master adverse to the contention, that the lease in the name of the father, Thomas Lally, was

merely a cover, put in his name to keep the interest of William P. Lally in the products and proceeds of the crops of the farm from his creditors, and that he was the real owner and lessee, and that his time and labor went to produce them, and that it was the real understanding between himself and his father that they were to be and were his and at his disposal as compensation for work done on the farm and in managing it and boarding the hired help. On the other hand, it is contended that the father, desiring to aid this improvident son and his family, and aid them in procuring and having a living, took this way of doing it, and of protecting himself and the son from a further accumulation of debts and liabilities, and that he had a right so to do. The contention is that this son was to have the living of himself and family from the proceeds of the farm as he went along, and nothing more, and that this was the understanding, and that he did have this, and that he at no time owned any interest in the stock or implements on the farm, or in the crops or products thereof or of the dairy. The special master has arrived at this latter conclusion. He had the advantage of seeing and hearing the witnesses, and his conclusions ought not to be lightly disturbed or overruled. The attorney for the bankrupt thus describes him:

"William P. Lally, the bankrupt, while a 'good worker,' is not and never will be capable of earning his own living, unaided. He has never succeeded in any business which he has undertaken, whether in speculating in hay, which enterprise resulted in several judgments and claims against him, or in running a thresher and silo filler, which culminated in the Norton judgment. Such being the case, the father, Thomas Lally, put him on this farm as his superintendent, under his own immediate direction, however, and so placed him in a position where he [William] could obtain his own living and a living for his wife and two small children."

[1, 2] It goes without saying that a court in bankruptcy ought to frown on and discourage any scheme or arrangement made in fraud of creditors; or entered into for the purpose of hindering, delaying, or defrauding creditors, or entered into for the purpose of covering or keeping the property or earnings, exempt from levy and sale on execution or legal process, from creditors. No citation of authorities is required for such propositions as these. In this case it was incumbent on the objecting creditor to show by a fair preponderance of the evidence, either an agreement or contract giving the son an interest in these farm products and the stock on the farm, one or both, or facts and circumstances from which it would be the duty of the court to find such an agreement. The findings of fact of a special master, or of a referee, in bankruptcy matters, stand in substantially the same position before the court as does the verdict of a jury. They are not to be disturbed, unless unsupported by the evidence or against the weight thereof. Poff v. Adams et al., 226 Fed. 187, 141 C. C. A. 185, and cases there cited. The court says:

"Creditors opposing a discharge have the burden of proving by satisfactory evidence the charges against the bankrupt of transferring or concealing his property with the intent to hinder, delay, or defraud creditors; but the findings of fact by the special master and the District Court will not be disturbed by this court, except upon the clearest conviction that the find-

ings are not supported by the evidence. In re Hoffman (D. C.) 173 Fed. 235; In re Hatem (D. C.) 161 Fed. 896; In re Noyes Bros., 127 Fed. 286, 62 C. C. A. 218; In re Schulman, 177 Fed. 191, 101 C. C. A. 361; In re Buckingham v. Estes, 128 Fed. 584, 63 C. C. A. 20; Osborne v. Perkins, 112 Fed. 127, 50 C. C. A. 158."

In Re Braun, 239 Fed. 113, 152 C. C. A. 155, it was held that, in view of presumption of honesty, creditors opposing discharge on ground that bankrupt had been guilty of fraudulent transfer of his property have burden of proof. In Re Wix (D. C.), 236 Fed. 262, affirmed Sherwood Shoe Co. v. Wix, 240 Fed. 692, 153 C. C. A. 490, it was held that as the discharge in bankruptcy is a great privilege and right the burden rests on a creditor objecting to a discharge to show that the bankrupt is not entitled thereto.

While the burden of sustaining objections filed to the discharge of a bankrupt rests upon the objecting creditor, I think the reason for the rule rests on the basis that it is an independent proceeding, and that when the bankrupt comes into court with a proper certificate of conformity, showing he has performed all the acts he is required by the bankruptcy act to perform as preliminary to his discharge, the independent objections of creditors raise a new issue which they must sustain by proof. When the bankrupt applies for his discharge and shows conformity by the proper certificate, he is entitled thereto, unless it appears on objections sustained by evidence that he has in some way violated the provisions of section 14b of the Bankruptcy Act (Act July 1, 1898, c. 541, 30 Stat. 550 [Comp. St. § 9598]), which declares:

"The judge shall hear the application for a discharge and such proofs and pleas as may be made in opposition thereto by the trustee or other parties in interest, at such time as will give the trustee or parties in interest a reasonable opportunity to be fully heard, and investigate the merits of the application and discharge the applicant unless he has (1) committed an offense punishable by imprisonment as herein provided; or (2) with intent to conceal his financial condition, destroyed, concealed, or failed to keep books of account or records from which such condition might be ascertained; or (3) obtained money or property on credit upon a materially false statement in writing, made by him to any person or his representative for the purpose of obtaining credit from such person; or (4) at any time subsequent to the first day of the four months immediately preceding the filing of the petition transferred, removed, destroyed, or concealed, or permitted to be removed, destroyed, or concealed, any of his property, with intent to hinder, delay, or defraud his creditors; or (5) in voluntary proceedings been granted a discharge in bankruptcy within six years; or (6) in the course of the proceedings in bankruptcy refused to obey any lawful order of, or to answer any material question approved by, the court: Provided, that a trustee shall not interpose objections to a bankrupt's discharge until he shall be authorized so to do at a meeting of creditors called for that purpose."

The language used plainly and unequivocally indicates that *the allegations and proofs in opposition to a discharge* are to precede any proofs on the part of the bankrupt, and expressly states that the bankrupt is to be discharged "unless he had," etc. It is very clear that the commission of some act which will defeat a discharge is to be made to appear by evidence.

In re Cooper, 230 Fed. 991, 145 C. C. A. 185 (2d Circuit) is not to the contrary. In that case it was made to appear that the bankrupt owned certain lots at one time prior to his bankruptcy (not at a remote time). He had not included such property in his schedules. The bankrupt, on application for discharge, testified he had sold these lots prior to his bankruptcy. There was no other witness as to such sale, and there was no corroborative evidence of such alleged sale. It appearing positively on the part of the objecting creditors that the bankrupt owned the lots shortly before bankruptcy, it was held by Judge Hand and also by the Circuit Court of Appeals that this made it incumbent on the bankrupt to show by satisfactory evidence that he had sold such lots before bankruptcy. This was not a holding that in the first instance it was the duty of the bankrupt to prove he did *not* own real estate, or the lots in question at the time of his bankruptcy, but that the objecting creditors having shown that he did the burden then fell upon the bankrupt of showing he had disposed of them, and that he had failed so to do.

In the instant case the objecting creditor was under the necessity of relying on the testimony of the father of the bankrupt and that of Miss Peck, mainly, and this fact is given due weight.

If it had appeared that this son, the now bankrupt, was, or ever had been, a good business man, one who had been successful, even in a moderate degree, in accumulating property in business, or by savings from his labor, the case would be different; but, as seen, it is conceded on all hands that he was such a person as would not be expected to save, or accumulate from any source, and in the absence of evidence that he did it does not follow that because he worked the farm he owned an interest in the stock or implements on or products of the farm. The evidence and concessions on all hands show a very good reason why the father would not have been a party to the creation of a situation which would give the son an ownership in any of the products of the farm, other than the right from time to time to supply his table for himself and family and purchase necessary clothing. It cannot be denied that the father, from his own means and on his own credit, had the right to support this improvident son and his family in such lawful manner as he saw fit to adopt.

I fail to find such satisfactory evidence that the method adopted was to cover or conceal from creditors the earnings of the son, now bankrupt, as demands a refusal to confirm the report of the special master. We may suspect that such was the purpose, and the loose methods pursued give some basis for such suspicion; but, at the same time, fatherly kindness and interest in the son and grandchildren, combined with family pride, will excuse a failure to exercise that strong and direct control over the management of the farm and business methods of the son in conducting it as would make plain to the world the exact relations existing. There is no evidence that what the son received from time to time by way of housing and board for himself, wife, and children was inadequate compensation for the services rendered. It is true that it does not satisfactorily appear what the son

did with all the money he received; but this appears to have been due to lax bookkeeping, or no bookkeeping, rather than to an intent to conceal or defraud. The father seems to have kept a firm hand on the proceeds of the hops, and to have dealt with them and their proceeds as his own. This fact is inconsistent with ownership of the lease and products of the farm by the son, or with any concession by the father that they were the property of the son.

[3] Under subdivision 4 of section 14 of the Bankruptcy Act, to defeat his discharge, the bankrupt, at some time "subsequent to the first day of the four months immediately preceding the filing of the petition," must have transferred, removed, destroyed or *concealed,* or permitted to be removed, destroyed or concealed any [some] of his property with intent to hinder, delay or defraud his creditors," and to constitute an offense under section 29b which will bar a discharge, so far as applicable in this case, the bankrupt must have "knowingly and fraudulently concealed while a bankrupt * * * from his trustee any [some] of the property belonging to his estate in bankruptcy," or "made a false oath * * * in, or in relation to any [his] proceeding in bankruptcy." It has been several times decided that to sustain either of these charges the evidence must be clear, convincing and satisfactory. It is not enough that strong suspicion is created by the testimony. The inferences should be such as to carry conviction, not, however, beyond a reasonable doubt, but such as to satisfy the reasonable mind.

The question of discharge is a civil action or proceeding, and not a criminal case, although it may involve a criminal act or acts, and in such case it is the duty of the court or jury to resolve the issues of fact according to a reasonable preponderance of the evidence. United States v. Regan, 232 U. S. 37, 47, 48, 34 Sup. Ct. 213, 58 L. Ed. 494. Here the evidence is such as to be consistent with honesty of purpose in making the arrangement testified to by the father of the now bankrupt between himself and Miss Peck, and that such arrangement was made, not to hinder, delay, or defraud creditors, or conceal any property of the son, or his earnings, but to assist him in making and having an honest living for himself and his family. See cases cited in 7 C. J. pp. 390, 391.

The case is not one where the court would be justified in reversing or disregarding the findings and conclusions of the special master, and his report will be confirmed.